**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| MISTY PUCKETT, | CASE NO. 3:13-CV-01486 |
| Plaintiff, | |
| v. | MAGISTRATE JUDGE VECCHIARELLI |
| CAROLYN W. COLVIN,<br>Acting Commissioner of Social<br>Security, | **MEMORANDUM OPINION AND ORDER** |
| Defendant. | |

Plaintiff, Misty Puckett ("Plaintiff"), challenges the final decision of Defendant,

Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner"), denying

her applications for a Period of Disability ("POD"), Disability Insurance Benefits ("DIB"),

and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security

Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant

to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate

Judge pursuant to the consent of the parties entered under the authority of 28 U.S.C. §

636(c)(2).  For the reasons set forth below, the Commissioner's final decision is

AFFIRMED.

## I.    PROCEDURAL HISTORY

On February 8, 2010, Plaintiff filed her applications for SSI, POD, and DIB and

alleged a disability onset date of October 14, 2009.  (Transcript ("Tr.") 13.)  The

applications were denied initially and upon reconsideration, and Plaintiff requested a

hearing before an administrative law judge ("ALJ").  (*Id.*)  On February 1, 2012, an ALJ

held Plaintiff's hearing.  (*Id.*)  Plaintiff participated in the hearing, was represented by counsel, and testified.  (*Id.*)  A vocational expert ("VE") also participated and testified.  (*Id.*)  On March 6, 2012, the ALJ found Plaintiff not disabled.  (Tr. 10.)  On June 12, 2013, the Appeals Council declined to review the ALJ's decision, and the ALJ's decision became the Commissioner's final decision.  (Tr. 1.)

On July 10, 2013, Plaintiff filed her complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 11, 12.)

Plaintiff asserts the following assignments of error: (1) The ALJ erred in determining Plaintiff's residual functional capacity; and (2) the ALJ's Step Five determination is contrary to law because it failed to take into consideration all of the signs and symptoms that flow from Plaintiff's severe impairments.

## II.   EVIDENCE

### A.   Personal and Vocational Evidence

Plaintiff was born in July 1974 and was 35-years-old on the alleged disability onset date.  (Tr. 22.)  She had at least a high school education and was able to communicate in English.  (*Id.*)  She had past relevant work as a certified nurse assistant and a personal care aide.  (*Id.*)

### B.   Medical Evidence

#### 1.   Physical Impairments

##### a.   Medical Reports

In February 2009, Plaintiff sustained a work-related injury that was initially

2

diagnosed as an ankle sprain.  (Tr. 362-363.)  Leamon Williams, M.D., prescribed an ankle walker and recommended that Plaintiff alternate sitting/standing work, with sitting 40% of the workday.  (Tr. 363.)  On February 6, 2009, Dr. Williams noted that Plaintiff complained of a "funny feeling" at her Achilles insertion that caused her great pain.  (Tr. 361.)  Dr. Williams reported that pain pills were controlling Plaintiff's pain and that wearing a boot was also helping.  (*Id.*)  Dr. Williams recommended that Plaintiff continue working but "with sit-down only work."  (*Id.*)  On February 12, 2009, an MRI revealed "some mild tendonitis, but not acute tendonitis or tear."  (Tr. 359.)

On March 16, 2009, Scott D. Karr, M.D., performed a right secondary Achilles tendon repair, gastrocnemius recession, and excision of Haglund deformation.  (Tr. 349-351.)  On June 9, 2009, Dr. Karr noted that Plaintiff was doing well post-operatively, and placed temporary work restrictions on her by limiting her to "sitting work" for three weeks.  (Tr. 343.)  He instructed Plaintiff to return to work with modified duties for four weeks beginning on February 3, 2010, with a restriction to sitting work only and weight-bearing as tolerated.  (Tr. 320.)  On February 15, 2010, Dr. Karr found that Plaintiff had reached maximum medical improvement[1] for worker's compensation purposes.  (Tr. 318.)

On August 30, 2010, Plaintiff visited the emergency room complaining that she had stood up and developed sudden severe pain in the posterior aspect of her ankle. (Tr. 413.)  On examination, Plaintiff had good dorsiflexion and plantar flexion of her

---

[1]  "Maximum medical improvement" in the context of workers compensation occurs when an injured employee reaches a point where her condition cannot be improved any further.

ankles bilaterally.  (*Id.*)  She had normal peroneal tendon strength but decreased strength in the right ankle secondary to pain.  (*Id.*) She had no instability of the ankles, but was tender over the insertion of the Achilles tendon.  (*Id.*)  Her ankle x-ray showed no evidence of talar joint arthritis.  (*Id.*)  Plaintiff's MRI was interpreted as showing an osteochondral lesion of the medial talar dome with associated edema, with postsurgical changes and thickening of the Achilles' tendon, without evidence of a re-tear.  (Tr. 415, 500.)  She was diagnosed with tendonitis, provided a supply of Vicodin, and instructed to wear a supportive shoe.  (Tr. 413-414.)

#### b.    Agency Reports

On December 3, 2010, consultative examiner Lamberto Diaz, M.D., concluded that Plaintiff was unable to perform even sedentary work due to her mental and physical condition.  (Tr. 459.)  He stated that Plaintiff's diabetes mellitus was poorly controlled and that she was very obese and not very muscular.  (Tr. 459.)  He added that her ruptured Achilles tendon required her to wear a brace, walk slowly, and use a cane or walker for ambulation.  (Tr. 458.)

On February 10, 2011, W. Jerry McCloud, M.D., a state agency physician, reviewed the available evidence and rejected Dr. Diaz's opinion, finding "nothing in the file to indicate that [Plaintiff] cannot sit."  (Tr. 487.)   Dr. McCloud indicated that Dr. Diaz's opinion was "not consistent with the medical evidence," and contained "internal inconsistency."  (*Id.*)  Dr. McCloud opined that Plaintiff was capable of performing a limited range of light exertion work.  (Tr. 482-483.)  On June 14, 2010, state agency physician Sarah Long, M.D., reviewed and affirmed Dr. McCloud's opinion, finding that

4

Plaintiff was capable of a limited range of light exertion work.  (Tr. 399-406.)

### 2. Mental Impairments

#### a. Medical Reports

Plaintiff has been diagnosed with a bipolar mood disorder. (Tr. 273-274.)  In 2004, she was hospitalized for an attempted suicide by overdose of Klonopin and Skelaxin.  (Tr. 273.)  At the time, Plaintiff was upset because her mother had been paying more attention to her boyfriend, and Plaintiff felt rejected and attempted to overdose.  (Tr. 273-274.)  Plaintiff thereafter sought mental health treatment at Westwood Behavioral Health Center (WBHC), which continued through March 2005. (Tr. 479.)  She returned to WBHC after "a long period of absence" in December 2010, after she filed for disability benefits.  (*Id.*)  She reported that she had been hearing voices, which was causing her anxiety.  (*Id.*)  When her Celexa was discontinued, the auditory experiences stopped, but she continued to hear voices.  (*Id.*)

During Plaintiff's December 9, 2010, mental status examination with A.Y. Demosthene, M.D., Plaintiff's mood was depressed with episodic anxiety.  (*Id.*)  Her speech was logical, non-pressured, and organized.  (*Id.*)  She denied hallucinations and delusions, and homicidal or suicidal ideation.  (*Id.*)  Plaintiff was alert, had good word comprehension, and was aware of her surroundings and current events.  (*Id.*)  She had no memory deficits and her insight and judgment were normal.  (*Id.*)  Dr. Demosthene's diagnostic impression was mood disorder, with the need to rule-out bipolar disorder. (*Id.*)  He prescribed Abilify and Lamictal for Plaintiff's mood symptoms, Celexa, an anti-depressant, and Ambien, a sleep aide.  (*Id.*)

5

Plaintiff had a follow-up exam with Dr. Demosthene on January 20, 2011.  (Tr. 480.)  At that time, Plaintiff's mood was not depressed.  (*Id.*)  She described her affect as very labile during her menstrual cycle.  (*Id.*)  She stated that Lamictal had stabilized her moods and that she was sleeping better on Ambien.  (*Id.*)  Her appearance was good, and her speech was articulate and normal.  (*Id.*)  She denied hallucinations, delusions, and homicidal or suicidal ideation.  (*Id.*)  Plaintiff was alert, had good word comprehension, and was aware of her surroundings and current events.  (*Id.*)  She had no memory deficit and her insight and judgment were good.  (*Id.*)  Dr. Demosthene diagnosed bipolar disorder NOS and adjusted her medication dosages.  (*Id.*)

During Dr. Demosthene's April 14, 2011, examination, Plaintiff was upset because she had been denied Social Security benefits, while her husband's disability claim had been approved.  (Tr. 521.)  Her appearance was good, and her speech was articulate, but lacked spontaneity.  (*Id.*)  She denied hallucinations, delusions, and homicidal or suicidal ideation.  (*Id.*)  She was alert, had good word comprehension, and was aware of her surroundings and current events.  (*Id.*)  She had no memory deficit and her insight and judgment were limited.  (*Id.*)

During Plaintiff's June 9, 2011, exam, her appearance was good, and her speech was articulate and spontaneous.  (Tr. 522.)  She denied hallucinations, delusions, and homicidal or suicidal ideation.  (*Id.*)  She was alert, had good word comprehension, and was aware of her surroundings and current events.  (*Id.*)  She had no memory deficit and her insight and judgment were somewhat limited.  (*Id.*)

At her September 15, 2011, appointment with Dr. Demosthene, Plaintiff was

6

cooperative and appeared relaxed during the evaluation.  (Tr. 523.)  She presented her mood as depressed, and her affect was blunted and restricted in range.  (*Id.*)  Her thought process and speech were organized, slow, and goal-directed.  (*Id.*)  She denied hallucinations and delusions and had no suicidal or homicidal thoughts.  (*Id.*)  Plaintiff was alert and aware of her surroundings and of current events.  (*Id.*)  Her insight and judgment were not impaired.  (*Id.*)

At her October 13, 2011, appointment with Dr. Demosthene, Plaintiff was in good spirits.  (Tr. 524.)  She stated that Bupropion had helped her anxiety and depression. (*Id.*)  She was cooperative and sociable during the evaluation.  (*Id.*)  Her mood was not eurhythmic, her affect was in normal range, and her thought process was appropriate. (*Id.*)  Her pattern of speech was organized and goal directed, and she denied any hallucinations, delusions, and suicidal or homicidal ideation.  (*Id.*)  Plaintiff was alert and aware of her surroundings and current events, and her insight and judgment were not impaired.  (*Id.*)  Her mood medications were continued, and her sleeping medications were adjusted.  (*Id.*)

### b.    Agency Reports

On May 6, 2010, psychologist Paul A. Deardorff, Ph.D., conducted a mental examination of Plaintiff at the request of the Bureau of Disability Determination.  (Tr. 372-378.)  During the exam, Plaintiff reported that she had abused alcohol from the age of 16 "until a couple weeks ago."  (Tr. 373.)  She reported having been arrested as an adult for theft and jailed for 30 days.  (*Id.*)  She stated that she had worked steadily until injuring her Achilles tendon in 2009, but that she had been terminated from many other

7

jobs in her life for not showing up for work or "calling in dead." (Tr. 374.)  Dr. Deardorff described Plaintiff as cooperative, with adequate grooming and hygiene. (*Id.*)  She walked with a noticeable limp, appeared to be anxious and depressed, but displayed no other eccentricities of manner. (*Id.*)  Her conversation was neither pressured nor slowed, she displayed no loose associations or flight of ideas, and her speech was adequately organized and easily followed. (*Id.*)  Her phraseology, grammatical structure, and vocabulary suggested that she was of average intelligence. (*Id.*)

Plaintiff reported to Dr. Deardorff that she had attempted suicide in the past but was receiving no mental health treatment. (Tr. 375.)  She stated that she left her home "just to go to school," she had no friends, and she visited her mother weekly and saw her daughter on a daily basis. (Tr. 376.)  Plaintiff reported that she enjoyed crocheting and doing crossword puzzles, and she assisted with the household chores. (*Id.*)  Dr. Deardorff concluded that Plaintiff's ability to relate to others was limited between moderate to marked; her ability to understand, remember, and follow simple instructions was moderately limited; her concentration, persistence, and pace were moderately limited; and her ability to withstand the stress and pressures of daily work was markedly limited. (Tr. 377-378.)

On June 1, 2010, state agency psychologist David Dietz, Ph.D., reviewed the available evidence and rendered a mental residual functional capacity assessment. (Tr. 395-398.)  Dr. Dietz disagreed with Dr. Deardorff's opinion and found that Plaintiff was less than fully credible due to inconsistencies between her statements during the examination and the evidence in her file. (Tr. 397-398.)  Dr. Dietz found that Plaintiff was no more than moderately limited in all of the areas related to her mental ability to

8

work.  (*Id.*)  On February 10, 2011, and March 15, 2011, Patricia Semmelman, Ph.D., a

state agency psychologist, reviewed the available records and affirmed Dr. Dietz's

opinion.  (Tr. 489.)

On October 16, 2010, Neil Shamberg, Ph.D., performed a mental status

evaluation and mental functional capacity assessment.  (Tr. 526-534, 540.)  Dr.

Shamberg diagnosed Plaintiff with bipolar disorder, anxiety disorder NOS, and a

learning disorder NOS.  (Tr. 530.)  He concluded that Plaintiff's ability to relate to others

was markedly limited; her ability to understand, remember, and follow simple

instructions was moderately limited; her ability to understand, remember, and follow

simple instructions was moderately limited; her concentration, persistence, and pace

was mildly limited; and her ability to withstand the stress and pressures of daily work

was markedly limited.  (Tr. 531.)  Dr. Shamberg assigned Plaintiff a Global Assessment

of Functioning (GAF) score of 41.[2]  (*Id.*)

On November 4, 2010, psychologist Christopher C. Ward, Ph.D., conducted a

mental status examination.  (Tr. 446-450.)  Plaintiff described herself as a 36-year-old

married woman who lived with her husband.  (Tr. 446.)  She stated that she had no

income and her husband received unemployment benefits.  (*Id.*)  She indicated that she

was applying for disability benefits because her racing thoughts had turned into voices

over the last several months and that she felt like she was "in an overcrowded room,

---

[2]     The GAF scale incorporates an individual's psychological, social, and
occupational functioning on a hypothetical continuum of mental health
illness devised by the American Psychiatric Association.  A GAF score
between 41 and 50 indicates serious symptoms or any serious impairment
in social, occupational, or school functioning.

and wanted to scream." (Tr. 446.)  Plaintiff reported a good relationship with her current husband.  (*Id.*)  She admitted to spending 30 days in jail for theft and endorsed a history of alcohol and illicit drug abuse, but denied drug and alcohol abuse over the past several months.  (Tr. 447.)  She stated that she had received treatment for bipolar affective and anxiety disorders, including medication and counseling.  (*Id.*)  Her conversation was neither pressured nor slowed, she displayed no loose associations or flight of ideas, and her speech was adequately organized and easily followed.  (Tr. 448.)  Her phraseology, grammatical structure, and vocabulary suggested that she was of average intelligence.  (*Id.*)

Plaintiff was anxious and reported symptoms of depression.  (*Id.*)  She reported that her most recent mental health hospitalization was in 2003, and that she was not receiving any current mental health treatment.  (*Id.*)  Her remote recall was adequate, her short-term memory was below average, and her attention and concentration skills were somewhat limited.  (*Id.*)  Dr. Ward opined that Plaintiff was unable to withstand the stress and pressure associated with day-to-day work activity and was markedly impaired by her mental health difficulties.  (Tr. 449.)  He concluded that stress and pressure would exacerbate Plaintiff's problems with mood, leading to emotional breakdowns and further withdrawal behavior.  (*Id.*)

**C.    Hearing Testimony**

    **1.    Plaintiff's Hearing Testimony**

Plaintiff last worked in October 2009.  (Tr. 39.)  She ruptured her Achilles tendon of her right foot in 2008 and had surgery to repair it in March of 2009.  (Tr. 40.)  She re-

injured it about four or five times since then and suffered from tendonitis.  (*Id.*)  She experienced sharp pain in her foot, and if she stood for more than ten minutes, her entire leg would go numb.  (*Id.*)  She wore a boot so that she did not overstress her Achilles tendon.  (Tr. 42.)  Wearing the boot caused her to stand unevenly, which made her hips hurt.  (Tr. 42-43.)  Plaintiff testified that she also had uncontrolled diabetes, neuropathy on both of her feet, and hypothyroidism.  (Tr. 43-44.)

Plaintiff had a bipolar condition.  (Tr. 45.)  She testified that when she was not medicated, she would experience psychotic episodes where she would have audio and visual hallucinations and hear people talking to her.  (Tr. 45-46.)  She took medication for her bipolar condition, which caused her to feel tired and unfocused.  (Tr. 46.)

Plaintiff could do dishes, prepare food, fold laundry, bathe herself, and shop at WalMart.  (Tr. 48-50.)  She had a good friend that assisted her and her husband with their grocery shopping.  (Tr. 49.)  She used a cane, which was prescribed by her doctor.  (Tr. 49, 53.)  She had a driver's license but did not drive.  (Tr. 50.)  On a typical day, Plaintiff would do crossword puzzles, play on her computer and on Facebook, read, and watch TV.  (Tr. 51.)  Plaintiff testified that being in a group of people terrified her.  (*Id.*)

### 2.    Vocational Expert's Hearing Testimony

Sharon Ringenberg, a vocational expert, testified at Plaintiff's hearing.  The VE testified that Plaintiff's past relevant work was primarily as a certified nurse assistant and a personal care aid.  (Tr. 58.)

The ALJ asked the VE to consider a hypothetical individual of Plaintiff's age, education, and work experience who was limited to performing sedentary work involving

only two hours of standing or walking and six hours of sitting per workday.  (Tr. 58-59.)
The individual would also be limited to simple, routine, repetitive tasks; work where
there is no required production rate or pace; and only occasional interaction with the
public and with coworkers.  (Tr. 59.)  The VE testified that the hypothetical individual
would be capable of performing a significant number of jobs available in either the
regional or national economy, including an addressor, a table worker, and a
surveillance system monitor.  (Tr. 60.)  The VE indicated that if the hypothetical
individual was also limited to work involving only simple work-related decisions and few,
if any, workplace changes, the individual could not perform work as a surveillance
system monitor but could work as an optical final assembler.  (Tr. 61.)

### III.    STANDARD FOR DISABILITY

A claimant is entitled to receive benefits under the Social Security Act when she
establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y
of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  A claimant is considered
disabled when she cannot perform "substantial gainful activity by reason of any
medically determinable physical or mental impairment which can be expected to result
in death or which has lasted or can be expected to last for a continuous period of not
less than 12 months."  20 C.F.R. § 416.905(a).

The Commissioner reaches a determination as to whether a claimant is disabled
by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4); *Abbott
v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate
that she is not currently engaged in "substantial gainful activity" at the time she seeks

disability benefits.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience.  20 C.F.R. §§ 404.1520(d) *and* 416.920(d).  Fourth, if the claimant's impairment does not prevent her from doing her past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

## IV.   SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.   The claimant meets the insured status requirements of the Social Security Act through December 31, 2014.

2.   The claimant has not engaged in substantial gainful activity since October 14, 2009, the alleged onset date.

3.   The claimant has the following severe impairments: torn Achilles tendon status post repair, obesity, diabetes mellitus, bipolar disorder, osteoarthritis of the right knee, and moderate degenerative changes in the right knee.

4.   The claimant does not have an impairment or combination of

impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except she can lift and carry 10 pounds occasionally and five pounds frequently; stand/walk two hours out of an eight-hour day; sit six hours out of an eight-hour day; never climb ladders, ropes, or scaffolds; work should be limited to simple, routine, and repetitive tasks; no fast paced production requirements; work should involve only simple, work-related decisions and few, if any, work place changes; and she should have only occasional interaction with coworkers or public.

6.  The claimant is unable to perform any past relevant work.

7.  The claimant was born in July 1974 and was 35-years-old, which is defined as a younger individual age 18-44, on the alleged disability onset date.

8.  The claimant has at least a high school education and is able to communicate in English.

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

11.  The claimant has not been under a disability, as defined in the Act, from October 14, 2009, through the date of this decision.

(Tr. 15-23.)

## V.    LAW & ANALYSIS

### A.    Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether

14

the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010).  Review must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ.  *Id.*  However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record.  *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Brainard*, 889 F.2d at 681.  A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion.  *Ealy*, 594 F.3d at 512.

> **B.**   **Plaintiff's Assignments of Error**
>
> > **1.**   **The ALJ Erred in Determining Plaintiff's Residual Functional Capacity.**

Plaintiff argues that the ALJ's residual functional capacity (RFC) finding is "completed devoid of . . mandatory legal analysis."  (Plaintiff's Brief ("Pl.'s Br.") 8.) Specifically, Plaintiff contends that the ALJ disregarded the material portions of the

reports of four acceptable medical sources: (1) Dr. Shamberg's October 28, 2010, opinion that Plaintiff has a GAF score of 41 and is markedly impaired in her ability to relate to others and in her ability to withstand the stress and pressures associated with day-to-day work activity (Tr. 531); (2) Dr. Diaz's December 3, 2010, consultative report opining that Plaintiff is unable to perform even sedentary work (Tr. 459); (3) Dr. Deardorff's May 6, 2010, report finding that Plaintiff has a GAF score of 49 and is markedly impaired in her ability to withstand the stress and pressure associated with day-to-day work activity (Tr. 377-378); and (4) Dr. Ward's November 4, 2010, opinion that Plaintiff has a GAF score of 47 and is markedly impaired in her ability to relate to others including fellow workers and supervisors and in her ability to withstand the stress and pressure associated with day-to-day work activity.  (Tr. 450.)   For the following reasons, Plaintiff's argument is not well taken.

It is well established that an ALJ is not required to discuss each and every piece of evidence in the record for her decision to stand.  *See, e.g., Thacker v. Comm'r of Soc. Sec.*, 99 F. App'x 661, 665 (6th Cir. 2004).  However, where the opinion of a medical source contradicts his RFC finding, an ALJ must explain why he did not include its limitations in his determination of a claimant's RFC.  *See, e.g., Fleischer v. Astrue*, 774 F. Supp. 2d 875, 881 (N.D. Ohio 2011) (Lioi, J.) ("In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis.").  Social Security Ruling 96-8p provides, "[t]he RFC assessment must always consider and address medical source

16

opinions.  If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." SSR 96-8p, 1996 WL 374184, *7 (July 2, 1996).

Here, as the Commissioner notes, Plaintiff seemingly invokes the "good reasons" requirement of the treating physician rule[3] to argue that the ALJ erred by failing to provide valid reasons for assigning less than controlling weight to the opinions of Drs. Diaz, Deardorff, Ward, and Shamberg.  The aforementioned professionals, however, were consultative examiners, not treating physicians.  As a result, the ALJ was not required to evaluate their opinions with the same standard of deference as he would have applied to an opinion rendered by a treating physician who had an ongoing treatment relationship with Plaintiff.  Because Drs. Diaz, Deardorff, Ward, and Shamberg were consultative examiners, the ALJ was required only to acknowledge that their opinions contradicted his RFC finding, and explain why he did not include their

---

[3]      A treating source is defined as "your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you." 20 C.F.R. § 404.1502.  Generally, an ongoing treatment relationship exists when the patient sees or has seen the treating source with a frequency consistent with accepted medical practice for the type of evaluation required for the medical condition at issue. Id.  "An ALJ must give the opinion of a treating source controlling weight if he finds the opinion 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence in the case record.'" Wilson v. Comm'r of Soc. Sec., 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(d)(2)) (internal quotes omitted).  If an ALJ decides to give a treating source's opinion less than controlling weight, he must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight. See Wilson, 378 F.3d at 544 (quoting S.S.R. 96-2p, 1996 WL 374188, at *5 (S.S.A.)).

17

limitations in his determination of Plaintiff's RFC.  A review of the ALJ's decision

indicates that the ALJ adequately explained why he chose to give only "little" or "partial"

weight to their opinions.  (Tr. 19-21.)

- **Dr Diaz:** The ALJ gave little weight to Dr. Diaz's December 2010 opinion that Plaintiff is unable to do even sedentary work, because the ALJ found that opinion inconsistent with the record as a whole.  (Tr. 19.)  Furthermore, the ALJ noted that "Dr. Diaz's entire report is based on the claimant's own subjective explanation of her impairments and limitations and are not supported by the testing performed by Dr. Diaz on the claimant which were within normal limits, though he did not test the limits of her right ankle." (Tr. 19.)  Plaintiff incorrectly maintains that "no acceptable medical source supports a finding that Dr. Diaz's opinion is 'inconsistent with the record as a whole.'"  In February 2011, however, state agency physician Dr. McCloud reviewed the available evidence and rejected Dr. Diaz's opinion, finding "nothing in the file to indicate that [Plaintiff] cannot sit."  (Tr. 487.)  Dr. McCloud indicated that Dr. Diaz's opinion was "not consistent with the medical evidence," and contained "internal inconsistency."  (*Id.*)

- **Dr. Deardorff and Dr. Ward:** The ALJ gave partial weight to Dr. Deardorff's conclusions, noting that they were "only partially consistent with the record as a whole." (Tr. 21.)  The ALJ further stated that "[h]is conclusions regarding the claimant's moderate limitations are consistent with the record, but the record does not support any marked limitations." (*Id.*)  In assessing Dr. Deardorff's opinion, the ALJ cited to Exhibit 7F, which coincides with a May 2010 opinion from Dr. Deardorff, as well as Exhibit 14F, which is an opinion signed by Dr. Ward, not Dr. Deardorff.  (Tr. 21.)  Thus, as Plaintiff notes, the ALJ mistakenly attributed Dr. Ward's opinion to a second opinion by Dr. Deardorff.  The ALJ's error is immaterial, however, as he considered the substance of Dr. Ward's opinion and addressed it, even though he erroneously attributed the opinion to Dr. Deardorff.  Furthermore, while Plaintiff contends that "[n]o acceptable medical source supports the ALJ's assertion that [Dr. Deardorff's] (and apparently Dr. Ward's) favorable opinions are only partially 'consistent with the records as a whole,'" Plaintiff is mistaken.  (Pl.'s Br. 10.)  In June 2010, state agency psychologist Dr. Dietz disagreed with Dr. Deardorff's opinion and found that Plaintiff was less than fully credible due to inconsistencies between her statements during the examination and the evidence in her file.  (Tr. 397-398.)  Dr. Dietz found that Plaintiff was no more than moderately limited in all of the areas related to her mental ability to work.  (*Id.*)  State agency psychologist Dr. Semmelman affirmed this opinion.  (Tr.

489.)

- **Dr. Shamberg:** The ALJ gave little weight to Dr. Shamberg's opinion that Plaintiff suffered from anxiety and a learning disorder, noting that those diagnoses were "not fully supported by the record." (Tr. 21.) The ALJ gave partial weight to Dr. Shamberg's opinion that Plaintiff's ability to relate to others was markedly limited; her ability to understand, remember, and follow simple instructions was moderately limited; her concentration, persistence, and pace was mildly limited; and her ability to withstand the stress and pressures of daily work was markedly limited. (Tr. 21.) The ALJ found Dr. Shamberg's opinion only partially consistent with the record as a whole. (*Id.*) Furthermore, the ALJ noted that "the claimant's descriptions of her past experiences and current limitations were not fully consistent and therefore Dr. Shamberg's opinion cannot be given great weight as he would have had to rely on these statements from the claimant." (*Id.*)

In addition to discussing each of the four opinions above individually and explaining why he failed to give the opinions great weight, the ALJ specifically acknowledged in his decision that he considered "claimant's credibility as well as the conclusion of the treating and consultative examiners" when determining Plaintiff's RFC. (Tr. 20.) The ALJ explained that "[t]his is important, especially when it comes to consultative examiners because they rely on the claimant to be forthright when describing their mental health issues more than a treating doctor who would see the claimant on a regular basis and would have the opportunity to flush out any inconsistencies." (*Id.*) Thus, the ALJ was clear in that one of the reasons he rejected some of the consultative examiners' opinions is because they relied heavily on Plaintiff's own reports, which the ALJ found to be less than fully credible for specific reasons which he articulated. (*Id.*) In determining that Plaintiff was less than fully credible with regard to her complaints of disabling conditions, the ALJ noted:

- Plaintiff's activities of daily living include adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills,

19

maintaining a residence, caring appropriately for grooming and hygiene, using telephones and directories, and using a post office. (Tr. 16.)

- Plaintiff goes to school on a daily basis.  (*Id.*)

- Plaintiff assists with the household chores and showers two to three times a week.  (*Id.*)

- Plaintiff reads before bed and enjoys crochet and crossword puzzles as hobbies.  (*Id.*)

- Plaintiff sees her daughter daily.  (*Id.*)  She has reported both that she has a poor relationship with her daughter and that her daughter is her best friend.  (Tr. 20.)

- Plaintiff lives with her fiancé with whom she gets along.  (*Id.*)

- Plaintiff reported abuse by her sister, an ex-boyfriend, and a man who lived with her, but other records indicate that she had denied any kind of abuse history.  (*Id.*)

- Plaintiff reported that she could not comprehend anything nor do anything, yet no problems with comprehension had been observed otherwise.  (*Id.*)

- Plaintiff reported that she had a series of short inpatient stays including one in November 2010, but the medical record showed that the only previous inpatient stay was in 2004.  (*Id.*)

- Plaintiff did not report any type of posttraumatic stress disorder symptoms to some doctors yet alluded to such at the consultative examination.  (*Id.*)

Thus, the ALJ considered the medical record as a whole as well as Plaintiff's credibility in giving only "little" or "partial" weight to the opinions of the consultative examiners.

The ALJ's assessment of Drs. Diaz, Deardorff, Shamberg, and Ward's opinions is sufficiently clear to allow meaningful judicial review.  While the aforementioned opinions may be favorable to Plaintiff, the ALJ has adequately explained why he chose

20

not to rely on them in determining Plaintiff's RFC.  As Defendant correctly notes, Plaintiff's disagreement with how the ALJ weighed and resolved the medical opinion evidence is not a valid basis for reversing the ALJ's decision.  *See Bass v. McMahon, 499 F.3d 506, 509 (6th Cir. 2007)* ("If the ALJ's decision is supported by substantial evidence, then reversal would not be warranted even if substantial evidence would support the opposite conclusion.")  Here, the ALJ's RFC determination is supported by substantial evidence in the record.  While Plaintiff purports to argue that the ALJ relied solely on state agency psychologist Dr. Dietz's June 2010 opinion to determine Plaintiff's RFC, Plaintiff is mistaken.  A review of the ALJ's detailed decision indicates that he considered the evidence as a whole and did not rely entirely on a single piece of evidence while disregarding other pertinent evidence.  For the foregoing reasons, Plaintiff's first assignment of error does not present a basis for remand.

> **2. The ALJ's Step Five Determination is Contrary to Law Because It Fails to Consider All of the Signs and Symptoms that Flow from Plaintiff's Severe Impairments.**

Plaintiff argues that the ALJ's hypothetical question to the VE failed to accurately depict all of the limitations that flow from Plaintiff's markedly impaired ability to withstand the stress and pressure associated with day-to-day work activity.  Dr. Ward opined that Plaintiff is unable to withstand the stress and pressure associated with day-to-day work activity and is markedly impaired by her mental limitations.  (Tr. 450.) As discussed previously, the ALJ acknowledged this opinion, but concluded that "the record as a whole does not support any marked limitations."  (Tr. 21.)  Because the ALJ did not find that Plaintiff had any marked limitations, he was not required to include a

21

limitation concerning Plaintiff's ability to withstand the stress and pressures of daily work in Plaintiff's RFC.  The ALJ adequately accounted for Plaintiff's credible mental limitations by limiting her to simple, routine, repetitive tasks; no fast-paced production requirements; simple, work-related decisions; few, if any, workplace changes; and only occasional interaction with the public and co-workers.  (Tr. 17.)  Accordingly, Plaintiff's second assignment of error is without merit.

## VI.    CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

**IT IS SO ORDERED**.

s/ *Nancy A. Vecchiarelli*
U.S. Magistrate Judge

Date: April 21, 2014

22